WATKINS, Judge.
This case involves the interpretation of a 1972 cable television franchise ordinance enacted by the City of Baton Rouge and the Parish of East Baton Rouge (City-Parish). The ordinance regulates the cable television service provided to the area by the franchise. The current franchisee is Cablevision of Baton Rouge, Ltd. (Cablevision), which is the successor to Total CATV, Inc., the original defendant in the *1255 lawsuit. Cablevision appeals a judgment in the district court which imposed a franchise fee on three of the four classifications of revenues sought to be “taxed” by the City-Parish.
The parties agree that the five percent franchise fee imposed by the ordinance is owed on revenues from “generally receivable” [1] cable television subscribers. The parties also agree that the franchise fee is owed on revenues from the company’s customers who receive the “premium” channels.[2]
Subsequent to enactment of the franchise ordinance, the development by the cable service of four separate and distinct additional sources of revenue prompted this suit. The City-Parish claims the revenues are subject to the fee; Cablevision contends they are not. The four revenue classifications and sources are:
1. advertising income consisting of all receipts from the sale of advertising time on all available channels, including basic and premium service;
2. leased channel income consisting of all receipts from the Cablevision in-house classified ad channel (formerly the Capital City Press classified station);
3. programming or origination income consisting of all receipts from the exhibition of local-origin programming, such as the Jimmy Swaggart telecasts; and
4. amounts received pursuant to the imposition of a copyright fee paid since 1983 by Cablevision to the United States Copyright Royalty Tribunal from sums paid to Ca-blevision by its subscribers.
The trial court held that the franchise fee was due on all except the fourth classification of revenue. Thus, the judgment “taxes” advertising income, income from leased channel space, and origination income. Since the City-Parish neither appealed nor answered the appeal, the court’s ruling on the copyright-related revenue is not before us on appeal.
The pertinent parts of the ordinance, Paragraph 10.a.(l) and (2) provide:
City-Parish shall receive
(1) Five (5) per cent of the gross revenues, including all installation charges, less any subscriber-paid sales taxes, paid to Grantee by subscribers for those generally receivable public CATV services which are required and permitted by Sections 8, 8a, 8c, 8d, 8e, 8g and 8h above; and
(2) Five (5) per cent of the gross revenues, including all installation charges, less any customer-paid sales taxes, paid to Grantee by customers of those private and semi-private specialized communications services which are rendered by Grantee and are dependent wholly or substantially on Grantee’s use and occupancy of City-Parish Streets, public ways and places. (Emphasis supplied.)
Sections 8, 8a, 8c, 8d, 8e, 8g and 8h referred to in Paragraph 10.a.(l) above define the generally receivable public CATV services and the local origination programming required and permitted under the ordinance. Sections 8e and 8g read as follows:
[8e] Grantee may also provide system capacity for ‘leased access channels,’ said channels to be operated only in accordance with operating rules of Grantee. At Lessee’s option, leased access channels may be used for disseminating programs and information to the general public as a part of Grantee’s generally receivable public CATV services to subscribers, or they may be used for private and semi-private dissemination of programs, information and communications to customers of Lessee. (Emphasis supplied).
[8g] Immediately after Grantee shall have acquired 3,500 subscribers to its CATV service in City-Parish, Grantee shall provide, dedicate and maintain on a full-time basis, one (1) system television *1256 channel, and shall provide, install, operate and maintain all of the necessary equipment, studio, cameras, lights, microphones, slide-film chains, videotape recorder-players, etc., and shall employ necessary production and technical personnel, for the origination and dissemination of local television programming, and Grantee shall immediately begin the origination and dissemination of said local television programming to a significant extent. Said local television programming shall be a part of Grantee’s generally receivable public CATV services. Grantee may, at its discretion provide such local television program origination facility and service at any time sooner than the time it has acquired 3,500 subscribers. (Emphasis supplied).
We are guided in our interpretation of the above ordinance by the statutory and jurisprudential rules for construction and interpretation of state statutes. Bunch v. Town of St. Francisville, 446 So.2d 1357 (La.App. 1st Cir.1984); Louisiana Television Broadcasting Corp. v. Total C.A.T.V., 341 So.2d 1183 (La.App. 1st Cir.1976), writ refused, 343 So.2d 1076 (La.1977).
When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written. LSA-C.C. art. 9. When interpreting a law the court must presume that every word, sentence or provision in the law was intended' to serve some useful purpose, that some effect is to be given to each such provision, and that no unnecessary words or provisions were used. Conversely, it will not be presumed that the lawmaker inserted idle, meaningless or superfluous language in the law or that it intended for any part or provision of the law to be meaningless, redundant or useless. Bunch v. Town of St. Francisville, supra.
The thrust of the City-Parish’s argument is that the language, “five per cent of the gross revenues,” is broad enough to extend the franchise fee to revenues of any kind. The City-Parish urges that the language after the word “revenues,” should be read as pertaining only to installation charges and sales taxes which are paid to Cablevision by subscribers and customers.
Paragraph 10.a.(l) states that five per cent of the gross revenues paid by subscribers for those services required and permitted by Sections 8, 8a, 8c, 8d, 8e, 8g and 8h of the ordinance will be due to the City-Parish. Our reading of Section 8e reveals that it pertains to leased access channels and 8g pertains to origination programming.
Since 10.a.(l) refers specifically to 8e and 8g as part of the services required and permitted, for which subscribers pay revenues to Cablevision, and 8e and 8g concern leased access and origination programming, we conclude that the ordinance must be interpreted as applying the franchise fee to leased access and origination programming. Leased access channels may, at the option of Cablevision, be provided either to subscribers or customers and, therefore, revenues derived from this source are subject to the franchise fee under 10.a.(l) or 10.a.(2). Accordingly, we find no error in the trial court’s holding that the franchise fees are due on revenues from classifications 2 and 3 above.
We find no merit in the City-Parish’s suggestion that the word “customers” in paragraph 10.a.(2) is broad enough to encompass the persons who pay revenues in classification 1, which is basically revenues from advertising. We discern from a plain reading of the ordinance that the word “customers” was used to distinguish those persons who purchase premium channel programming from those persons who purchase generally receivable programming (the subscribers), but this distinction has little bearing on what is or is not to be taxed under the ordinance granting the franchise, other than the fact that 8e and 8g services go either to subscribers or customers. We find that the intent of the ordinance, when considered in its entirety, is to subject all revenues derived from services rendered either to subscribers or customers to the fee. We find nothing in the ordinance which refers to or is applicable to advertising revenues, and conclude that *1257 these revenues are not subject to the franchise fee.
We agree with the City-Parish that the local ordinance incorporated by reference the operational rules and technical standards for cable television adopted by the Federal Communications Commission by amendment to Chapter 1 of Title 47, Part 76 of the Code of Federal Regulations.[3] However, we find no merit ft the suggestion that we look to the Code of Federal Regulations to determine whether Cablevision’s gross revenues or Cablevision’s gross revenues from specified subscribers and customers are to be taxed. Originally, the federal regulations provided an example of “reasonable” franchise fees of “3-5 percent of the franchisee’s gross subscriber revenues.” The regulations were amended to place a ceiling on permissible franchise fees of three percent of the “franchisee’s gross revenues per year from all cable services in the community.” Because the amendment is a mere ceiling, not a requirement, it has no effect on the provisions of the local ordinance which designate the revenues subject to the franchise fee. The change in focus on the federal level from a regulation based on one method of calculation to a method based on a different method of calculation does not deprive the local ordinance of the binding effect of the provision defining the revenues which are “taxable.”
Accordingly, we reverse the judgment of the trial court insofar as it holds that Ca-blevision owes the franchise fee on revenues from advertising as set forth in classification 1. In all other respects the judgment of the trial court is affirmed. The costs on the trial level of $303.90 and the costs of this appeal of $267.52, are to be assessed one-half to each party.
AFFIRMED IN PART, REVERSED IN PART.

. "Generally receivable” service in the Baton Rouge area consists of 30 channels, including major networks and the super stations such as ESPN and CNN.

. Examples of "premium" channels are HBO, Cinemax, and the pay-per-view or “Select Event” programming.

. In 1984 Congress became involved in the field of cable operations, preempting the FCC. Section 622 of the Cable Communications Policy Act of 1984 deals with franchise fees; that section is now codified as 47 U.S.C. § 542.